IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARLON RAYFORD WADE, II,          :
                                  :
     Petitioner,                  :
                                  : CRIMINAL ACTION NO. 09-00094-CG
vs.                               :
                                  : CIVIL ACTION NO. 10-00590-CG-B
UNITED STATES OF AMERICA,         :
                                  :
     Respondent.                  :

### REPORT AND RECOMMENDATION

     This action is before the Court on Petitioner Marlon
Rayford Wade, II's Motion to Vacate, Set Aside, or Correct
Sentence under 28 U.S.C. § 2255 (Doc. 158), Addendum to
Petitioner's Motion to Vacate, Set Aside, or Correct Sentence
under 28 U.S.C. § 2255 (Doc. 161), Memorandum in Support of his
Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C.
§ 2255 (Doc. 165), and Respondent's Opposition thereto.  (Doc.
163).  This action was referred to the undersigned Magistrate
Judge for report and recommendation pursuant to 28 U.S.C. § 636
(b) and Rule 8(b) of the Rules Governing Section 2255 Cases.[1]  It

---

[1]  The Honorable United States District Judge Callie V. S.
Granade presided over the trial in this action and imposed the
challenged sentence.   On October 14, 2010, Judge Granade
referred the matter to the undersigned Magistrate Judge for
entry of a Report and Recommendation.   The undersigned has
reviewed the Petitioner's motion and related documents, the
transcripts of the guilty plea hearing and sentencing hearing,
and all other relevant documents in the Court's file and has
(Continued)

is now ready for consideration.  Because the record is adequate to dispose of this matter, no evidentiary hearing is required. It is recommended that Petitioner's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (Doc. 158) be denied, that this action be dismissed, and that judgment be entered in favor of Respondent, the United States of America, and against Petitioner Marlon Rayford Wade, II[2].

## I. BACKGROUND

On April 29, 2009, Petitioner was charged in a three-count indictment for violating 21 U.S.C. § 841(a)(1), possession with intent to distribute cocaine (Count One); 18 U.S.C. § 924(c)(1), possession of a firearm during a drug trafficking crime (Count Two); and forfeiture pursuant to 21 U.S.C. § 853 (Count Three). (Doc. 17).  On or about April 17, 2009, Wade retained attorney James M. Byrd to represent him.  (Docket entry April 17, 2009).

---

fully familiarized herself with the proceedings before Judge Granade.  Based upon that review, the undersigned makes the following report and recommendation.

[2]  More than seven months after Wade's Motion to Vacate had been fully briefed, Wade, on November 22, 2011, filed a motion (Doc. 184) requesting a copy of his sentencing transcript and all motions filed in the case.  In his motion, Wade asserts that the sentencing transcript has "now become a vital part of Defendant's case." (Id.). Aside from this conclusory assertion, Wade has offered no explanation for why the sentencing transcript is needed seven months after the briefing period concluded. Because Wade has not established a need for the sentencing transcript, his request is denied.

Through his retained counsel, Wade filed a Notice of Intent to rely on a public authority defense on May 6, 2009.  (Doc. 22).  On May 18, 2009, the United States filed a Motion in Limine seeking to prohibit Wade from being allowed to raise the public authority defense.  (Doc. 38).  Following Wade's response to the United States' objection to his public authority defense, and a reply from the United States, the Court held a hearing, and granted the United States' Motion in Limine, thus prohibiting Wade from raising or mentioning a public authority defense during his trial.  (Docs. 42, 43, 53, 140).

At the conclusion of a three-day trial, the jury found Wade guilty of count one, possession with intent to distribute cocaine, and not guilty of count two, possession of a firearm during a drug trafficking crime.  (Docs. 70, 134 at 58).  Wade filed three motions seeking a new trial.  Each was denied by the trial Court.  (Docs. 74, 79, 88, 98, 107).  Wade also filed his first Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 on December 4, 2009.  It was dismissed because it was filed prematurely.  (Docs. 110, 111).

At Wade's sentencing hearing conducted on December 8, 2009, Judge Granade sentenced Wade to 90 months in prison, and five years of supervised release following his release from prison. Wade was also ordered to pay a special assessment of one hundred

dollars.  (Doc. 139 at 17-19).  An Order of Judgment was entered on December 10, 2009.  (Doc. 113).

Wade filed a second Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 on December 14, 2009, and a Notice of Appeal on December 18, 2009.  (Docs. 114, 117, 118). Wade's Motion to Vacate was dismissed on the ground that the Court lacked jurisdiction to consider and rule on Wade's § 2255 Motion during the pendency of the direct appeal of his sentence. (Docs. 131, 142).

On October 1, 2010, the Eleventh Circuit affirmed Wade's conviction after finding that (1) Wade had shown no reversible error regarding the Court's denial of his request to present a public authority defense at trial; and that (2) the Court properly denied Wade's motions for a new trial.  United States v. Wade, 399 Fed. Appx. 471, 476-77 (11th Cir. 2010).

On October 14, 2010[3], the Clerk's Office received Wade's third Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, along with an addendum, which, combined consisted of over three hundred pages in length.  (Docs. 147,

---

[3] Wade's Certificate of Service bore a signature date of July 23, 2010.  (Doc. 147 at  114).  Absent evidence to the contrary, the Court assumes that the petition was delivered to prison authorities for mailing on the day that Petitioner signed it. See Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001).  Under the "mailbox rule," "a prisoner's pro se § 2255 motion is deemed filed the date it is delivered to prison authorities for mailing."  Id.

149).   The Court ordered Wade to refile his § 2255 on the Court's current form.   (Doc. 148).   Despite the Court's Order, Wade filed yet another § 2255 along with an addendum, which was still not in compliance with this Court's rules regarding such motions. (Docs. 150, 151).   The United States requested that the Court issue an order requiring Wade to again revise his § 2255 petition, and Wade objected to the Government's request.   (Docs. 153, 156).   The Court again directed Wade to file an amended § 2255 petition by February 15, 2011.   (Doc. 157).

On January 10, 2011, Wade filed his fourth § 2255 petition, as well as an addendum to that petition on January 24, 2011[4]. (Docs. 158, 161).   The United States, on March 14, 2011, filed a response in opposition to Wade's Motion to Vacate and argued that his claims should be denied as improperly pled and factually false, or denied pursuant to the law of the case law doctrine.   (Doc. 163).   On March 24, 2011, Wade filed a Memorandum in Support of his § 2255 petition.   (Doc. 165).

---

[4]   Additionally, on December 10, 2010, Wade filed a motion to reduce his sentence and a motion for release from custody based upon extraordinary circumstances.   Both motions were denied. (Doc. 154; Docket entry December 13, 2010).   On July 18, 2011, Wade filed a Motion for an Emergency Bond Hearing, which was denied on July 19, 2011.   (Docs. 171, 172).   Wade also filed, on August 19, 2011, a Motion for Jury Verdict to be Set Aside and Judgment Entered be Vacated Based Upon a Motion for Reconsideration, and on September 8, 2011, a Motion for Release on Personal Recognizance Pursuant to Rule 23(b)(3).   (Docs. 173, 174).   Both of these motions were subsequently denied. (Docs. 175, 176).

In Petitioner's present Motion to Vacate, Set Aside, or Correct Sentence under § 2255, he argues that he is entitled to habeas relief based upon the ineffective assistance of his trial counsel. Specifically, Wade claims that his attorney was ineffective for failing to properly prepare for trial, by not conducting a proper investigation, and by not properly issuing subpoenas for records, documents, and witnesses. Wade also claims that his counsel failed to provide a proper defense because he attempted to assert a public authority defense, as opposed to a more appropriate entrapment defense. Finally, Wade contends that his counsel failed to procure the proper paperwork and file the proper motions for a downward departure based upon Wade's "extraordinary family circumstance" and upon the fact that Wade gave information to the United States to aid in the prosecution of another person. (Docs. 158, 161).

## II.  **FACTS AT TRIAL**

On July 14, 2009, Wade, represented by attorney James M. Byrd, went on trial for the charges mentioned previously in this report. (Doc. 132). At trial, the testimony reflected that John Nixon, an officer with the FBI violent crimes task force of the Mobile Police Department, in late 2008, worked with Nathaniel Agee, an individual who was previously arrested for possessing with intent to distribute cocaine and who had pled guilty and agreed to cooperate and provide information about

6

others with whom he had sold or purchased drugs.  (Doc. 132 at 35-36, 84).  Agee provided information about various individuals, including Petitioner Wade.

At trial, Agee testified that prior to becoming an informant, he and Wade were friends and that he had sold drugs to Wade at various times in the past.  (Id. at 86-87).  Agee estimated that he had sold approximately an ounce and a half of crack cocaine to Wade, and nine ounces of cocaine.  (Id. at 87-88).  Agee further testified that he had witnessed Wade resell the drugs which Agee had sold to him.  (Id.).  Agee testified that his drug sales to Wade occurred over a period of approximately a year, until Wade temporarily moved to Texas for work, and that Wade attempted to buy cocaine in Texas for Agee.  (Id. at 87-89).

However, according to Agee, he was arrested in October 2008, on federal drug charges, and agreed to cooperate.  He entered into a plea agreement with the United States in December 2008, and was debriefed.  (Id. at 90).  In April 2009, Agee advised Officer John Nixon that Wade had been calling him for nearly two weeks in an attempt to buy cocaine from him.  (Id. at 82).  Agee also told Officer Nixon that Wade claimed that he had been given $10,000 from a group of attorneys to buy a kilogram of cocaine, but that the attorneys would take back the money if Wade did not buy the cocaine.  (Id.).  According to Agee, Wade

made a deal with Agee in which he agreed to give Agee a vehicle title and a gun as collateral for the cocaine. The rest of the money was to be paid once Wade sold the cocaine to his buyer. (Id. at 82, 91-92).

On April 15, 2009, with Officer Nixon's approval and under his supervision, Agee recorded several conversations with Wade regarding the impending drug transaction. (Id. at 37, 91-92). According to the conversations between Agee and Wade, Wade was planning to purchase a kilogram of cocaine from Agee for $19,000.00 on April 16, 2009. (Id. at 96). Specifically, during the recorded conversation, Agee states that he will "do that bit for 19." (Id.). During trial examination, Agee explained this statement to mean that he would sell the cocaine to Wade for $19,000.00. (Id.). During the same conversation, Wade is heard saying that he will "flip it overnight." (Id. at 97). Agee testified that he understood this to mean that Wade would sell the drugs overnight and have Agee's money by the morning. (Id.).

Pursuant to the conversations between Agee and Wade on April 15, 2009, a controlled sale was set for April 16, 2009, wherein Wade was to purchase one kilogram of cocaine from Nathaniel Agee. (Id. at 101). However, unbeknownst to Wade, officers from the Mobile Police Department were monitoring every aspect of this sale.

On April 16, 2009, prior to his scheduled meeting with Wade, Agee met with law enforcement officers who briefed him on the situation, searched him, searched his truck, and gave him a black tool box to place in the rear of the bed of his truck. (Id. at 102-03). The officers also wired Agee with an electronic device and placed a kilogram of cocaine in the tool box in the back of his truck. (Id. at 103). Agee then proceeded, followed by law enforcement, to a McDonald's location within the Mobile city limits, as previously agreed upon with Wade. (Id.).

Once Wade arrived at the McDonald's location, Wade exited his vehicle and entered Agee's vehicle carrying a manila envelope which contained a gun, a vehicle title and bill of sale in it. (Doc. 133 at 8). Wade gave these items to Agee, who proceeded to take the gun out of the truck and place it in the black tool box located at the back of his truck bed. (Id. at 10). Agee then removed the kilogram of cocaine from the black tool box, and gave it to Wade. (Id. at 11). Wade exited Agee's vehicle, carrying the kilogram of cocaine, wrapped in a piece of Agee's newspaper. (Id. at 12-13). Once Wade returned to his car and attempted leave the parking lot, Mobile police officers blocked him in, and Wade was placed under arrest. (Doc. 132 at 46). An immediate search of Wade's vehicle revealed the

cocaine, wrapped in the newspaper, laying on the front passenger seat. (Id. at 47-48).

Following Wade's arrest at McDonald's, he was transported to a prearranged location just a short distance from the restaurant. (Id. at 57). When Officer John Nixon first approached Wade after leaving the McDonald's location, Officer Nixon read Wade his Miranda rights, and Wade advised Officer Nixon that he wanted to speak with him privately. (Id. at 58-59). Officer Nixon testified at trial that Wade admitted that he was planning to resell the cocaine to a businessman in Mobile but that there was a middleman involved in the deal. (Id. at 59-60). According to Officer Nixon, Wade provided Nixon the name of the middleman, as well as the name of the businessman. (Id. at 60). Wade advised Nixon that Wade was to be paid upon delivery of the cocaine. (Id.). Wade was then taken into custody. (Id.).

At trial, Wade disputed Officer Nixon's account of the conversation following his arrest. Wade contends that he was buying the cocaine from Agee solely for the purpose of "setting up" Agee, and that his intent was to take the cocaine directly to Saraland Police Officer Kenny Matthews, whom Wade testified he knew from the past when Matthews had been called to Wade's house regarding drug activity on Wade's street. (Doc. 133 at 113, 130, 152).

Wade further denied ever conducting any prior drug deals with Agee. (Id. at 116). Wade testified that he had owned a pawn shop and roofing business in 2007, which is how he met Agee. (Id. at 115). Wade explained that when he traveled to Texas for work in 2008, Agee loaned him $2000 for the trip. Wade acknowledged that he has no documentation for the loan, but denied that the money was in any way connected to drug dealings. (Id. at 123, 143-144). According to Wade, while in Texas in December 2008, he sent Agee a $500 MoneyGram as partial repayment for the loan because Agee had sent a text message threatening to hurt Wade's children if Wade did not repay the loan. (Id. at 125-26, 144). No evidence of the threatening text message was ever presented in court. (Id. at 144-45). Wade admitted that he never reported the alleged threatening text message to law enforcement in either Texas or Alabama. (Id. at 142-43).

Wade testified that he returned to Mobile in December 2008, and that Agee contacted him in March of 2009. According to Wade, Agee told him he was "making plenty of money" and not to "worry about that money" that Wade owed Agee but that Agee needed Wade to "help [him] get rid of this coke." (Doc. 126, 133 at 128, 143). Wade claimed that he turned Agee down approximately 15 times. (Id. at 129). Wade admitted that he did speak with Agee numerous times regarding buying the kilogram

11

of cocaine, but claimed that there was no real buyer for the drug and that Wade's purpose was to "set up" Agee.  (Id. at 135, 137-38, 149).   Wade admitted that he took possession of the cocaine from Agee, but testified that his plan was to take the cocaine to Saraland Police Officer Matthews with the expectation that Officer Matthews would then go and find and arrest Agee. (Id. at 152).

Officer Kenny Matthews testified at trial that he was a Saraland patrol officer who did no undercover drug work.  (Id. at 168).   Officer Matthews further testified that his jurisdiction was Saraland, and he had no jurisdiction to work matters in the City of Mobile.  (Id. at 169).  Officer Matthews stated that he never considered Wade an informant, and that in his job with the Saraland Police Department, he did not handle informants.  (Id.).  Officer Matthews testified that he was not aware of Wade's plan to purchase cocaine, nor of his actual purchase of  cocaine on April 16, 2009. Officer Matthews further testified that he did no know of anyone in the Saraland Police Department who was aware of Wade's plan or purchase.  (Id. at 170).  According to Officer Matthews, he was not even aware that a drug transaction was occurring on April 16, 2009.  (Id.).

## III. <u>DIRECT APPEAL</u>

Wade, represented by attorney Neil L. Hanley, appealed his conviction.   He argued that the trial Court abused its

discretion in (1) precluding Wade from presenting a public authority defense; and (2) denying Wade's motion for a new trial based on newly discovered evidence.   United States v. Wade, 399 Fed. Appx. 471 (11th Cir. 2010).   In denying Wade's appeal with respect to the public authority defense, the Eleventh Circuit noted that "[a]t the evidentiary hearing, Wade presented absolutely no evidence whatsoever that Officer Matthews, a patrol officer in Saraland, Alabama, had any authority to sanction Wade to act in an undercover capacity in Mobile, Alabama," and further stated that "[t]o the contrary," testimony was presented indicating that "Matthews had no such authority." Id. at 476.   The court further stated the following:

> To the extent Wade makes a separate claim that the district court's evidentiary rulings at trial about the substance of his conversations with Officer Matthews denied him due process, Wade has not articulated what else Wade and Officer Matthews would have testified to regarding their conversations, and how such testimony would have assisted Wade's defense or changed the outcome of his trial. Moreover, the trial transcript reveals that Wade was allowed to testify extensively that he called Agee back "[t]o set him up with Kenny Matthews … to bust him for selling drugs," and the reasons for his involvement in the drug transaction. Officer Matthews was allowed to testify regarding his interactions with Wade about prior methamphetamine drug activity, the subsequent methamphetamine arrests, and that after talking with Wade in April 2009, he attempted to contact a narcotics officer for the City of Saraland.  Wade has not shown what else his testimony regarding the

13

> content of his conversation with Officer
> Matthews would have added. Alternatively,
> Wade has not shown how such additional
> testimony would have made a difference in
> the outcome of his trial. Accordingly, Wade
> has shown no reversible error in this
> regard.

Id. at 476-77.

Regarding Wade's claim that he was entitled to a new trial based upon the false testimony by Agee that he did not have a child when he in fact has a daughter, the Eleventh Circuit noted that "[w]hen Agee's testimony during Agee's sentencing hearing conflicted with his prior trial testimony in Wade's trial, the government immediately notified Wade's defense counsel of the discrepancy." Id. at 477. The court stated that "Wade [had] not shown the trial prosecutor *purposely or knowingly* withheld this information from Wade's defense counsel." Id. The court further held the following:

> Alternatively, Wade has failed to show a
> reasonable likelihood that Agee's false
> testimony about his daughter could have
> affected the judgment of the jury. Wade
> contends that exposing Agee's false
> testimony during cross-examination regarding
> his daughter would have undermined the
> credibility of the government's main
> witness. However, the record reveals that
> Wade's defense counsel was able to cross-
> examine Agee thoroughly. Wade's defense
> counsel impeached Agee's credibility by
> eliciting testimony about Agee's two prior
> felony convictions for receiving stolen
> property and trafficking in cocaine, his
> arrest on October 28, 2009 for attempt to
> possess cocaine, and his subsequent plea

agreement under which he agreed to cooperate
with the authorities in exchange for the
government's motion for a reduction in his
sentence.  Agee testified that on December
5, 2008, Wade sent Agee $500 as partial
payment for a prior drug transaction.
Wade's defense counsel elicited Agee's
admission that, ten days later, after
agreeing to cooperate fully with the
authorities and disclose all information
regarding his drug activities, Agee failed
to include this transaction in his statement
to authorities.  The fact that Agee also
lied about having a daughter would have
added little to the defense counsel's
thorough cross-examination.

Moreover, the evidence presented at trial
supporting Wade's conviction was
substantial, including undisputed evidence
that Wade exchanged the gun and vehicle
title for a kilogram of cocaine and then was
arrested with the cocaine in his possession.
For these reasons, we cannot say that there
is a reasonable likelihood that Agee's false
testimony about his daughter could have
affected the judgment of the jury.

Id. at 477-78.

## IV. **DISCUSSION**

The Sixth Amendment guarantees a criminal defendant the
right to "reasonably effective" legal assistance.  Strickland v.
Washington, 466 U.S. 668, 687 (1984).  In order to establish
ineffective assistance of counsel, a defendant first must show
that his counsel's representation "fell below an objective
standard of reasonableness," that is, that his counsel "made
errors so serious that counsel was not functioning as the
'counsel' guaranteed the defendant by the Sixth Amendment."  Id.

at 687-88.   Second, a defendant must show that the deficient performance prejudiced his defense, *i.e.*, that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687.

The inquiry into the first element, whether a lawyer has provided effective assistance, is an objective one: "a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." <u>Van Poyck v. Florida Dep't of Corrs.</u>, 290 F.3d 1318, 1322 (11th Cir. 2002).   "A strong presumption exists that the challenged action constitutes sound trial strategy." <u>Chatelain v. Singletary</u>, 89 F.3d 749, 752 (11th Cir. 1996).

To establish the second element, prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Mills v. Singletary</u>, 63 F.3d 999, 1020 (11th Cir. 1995) (citing <u>Strickland</u>, 466 U.S. at 694). "Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, <u>see</u> <u>id.</u>, or vice versa." <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000).

"Establishing these two elements is not easy: 'the cases in which habeas petitioners can properly prevail on the ground

16

of ineffective assistance of counsel are few and far between.'"
Van Poyck, 290 F.3d at 1322 (citations omitted).  The court's
role in reviewing an ineffective assistance claim "is not to
'grade' a lawyer's performance."  Id.  Instead, it is to
determine "only whether a lawyer's performance was within 'the
wide range of professionally competent assistance.'"  Id.
(citations omitted).

The Supreme Court in Strickland explained:

> Judicial scrutiny of counsel's performance
> must be highly deferential.  It is all too
> tempting for a defendant to second-guess
> counsel's assistance after conviction or
> adverse sentence, and it is all too easy for
> a court, examining counsel's defense after
> it has proved unsuccessful, to conclude that
> a particular act or omission of counsel was
> unreasonable.  Cf. Engle v. Isaac, 456 U.S.
> 107, 133-134, 102 S. Ct. 1558, 1574-1575, 71
> L. Ed. 2d 783 (1982).  A fair assessment of
> attorney performance requires that every
> effort be made to eliminate the distorting
> effects of hindsight, to reconstruct the
> circumstances of counsel's challenged
> conduct, and to evaluate the conduct from
> counsel's perspective at the time.  Because
> of the difficulties inherent in making the
> evaluation, a court must indulge a strong
> presumption that counsel's conduct falls
> within the wide range of reasonable
> professional assistance; that is, the
> defendant must overcome the presumption
> that, under the circumstances, the
> challenged action "might be considered sound
> trial strategy."  See Michel v. Louisiana,
> 350 U.S. [91] at 101, 76 S. Ct. [158] at 164
> (1955).  There are countless ways to provide
> effective assistance in any given case.
> Even the best criminal defense attorneys

                    would not defend a particular client in the
                    same way.

Id. at 689.   With these principles in mind, the Court now
considers Wade's ineffective assistance of counsel claims.

    A. Claim One:   Ineffective Assistance of Counsel in Failing
to Properly Prepare for Trial

    Wade argues that his trial counsel was ineffective for
failing to properly prepare for trial because he did not conduct
a proper investigation and did not properly issue subpoenas for
records, documents, and witnesses.   Wade claims that because of
his counsel's improper trial preparation, his trial counsel
failed to conduct an effective cross-examination of the
government's witnesses, and failed to call key witnesses on
Wade's behalf.

        1. Failure to Investigate

    Throughout his numerous pages of rambling allegations filed
with the Court, Wade makes generalized claims against his trial
counsel for failing to properly investigate his case prior to
trial.  (Doc. 158; Doc. 158, Attachment 1).   One central claim
that Wade reiterates is his counsel's lack of investigation with
respect to testimony offered by government witness Agee that he
did not have any children.   Wade claims that a lack of
investigation caused his counsel to be unprepared to impeach
Agee when Agee perjured himself by testifying that he has no

                              18

children, when in fact he has a daughter.  Wade asserts that his attorney should have known this information and should have been prepared with the information to impeach Agee during the trial. (Doc. 158 at 4, 8).  However, this issue was presented and determined by the Eleventh Circuit on appeal; thus, it due to be denied under the "law of the case" doctrine.

"Under the 'law of the case' doctrine, the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the trial court or on a later appeal." Norelus v. Denny's, Inc., 628 F.3d 1270, 1288 (11th Cir. 2010) (quoting Heathcoat v. Potts, 905 F.2d 367, 370 (11th Cir. 1990) (citation and quotation marks omitted); see also Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1291 (11th Cir. 2005) ("The [law-of-the-case] doctrine operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior appeal."). The doctrine applies to those issues that were decided "either explicitly or by necessary implication" in the earlier appeal. United States v. Jordan, 429 F.3d 1032, 1035 (11th Cir. 2005). "The law of the case doctrine, self-imposed by the courts, operates to create efficiency, finality and obedience within the judicial system." Moulds v. Bullard, 452 Fed. Appx. 851, 853 (11th Cir. 2011) (quoting Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1511 (11th Cir. 1987)).

19

The exceptions to the law of the case doctrine are narrow. "Under the law of the case doctrine, both the district court and the court of appeals are bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case unless (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to that issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." Harris v. Corrections Corp. of America, 433 Fed. Appx. 824, 825 (11th Cir. 2011) (quoting United States v. Stinson, 97 F.3d 466, 469 (11th Cir. 1996)).

On direct appeal, Wade argued, just as he does now, that by exposing Agee's false testimony during cross-examination regarding the fact that he does have a child, defense counsel would have undermined the credibility of government's main witness. The Eleventh Circuit disagreed, noting that "the record reveals that Wade's defense counsel was able to cross-examine Agee thoroughly." Wade, 399 Fed. Appx. at 477-78. The court also found that "the evidence presented at trial supporting Wade's conviction was substantial, including undisputed evidence that Wade exchanged the gun and vehicle title for a kilogram of cocaine and then was arrested with the cocaine in his possession. For these reasons, we cannot say that there is a reasonable likelihood that Agee's false

testimony about his daughter could have affected the judgment of the jury." Id.

The Eleventh Circuit's findings of fact and conclusions of law as to the issue are binding on this Court in this matter. Norelus, 628 F.3d at 1288 ("The [law-of-the-case] doctrine operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior appeal."). Therefore, pursuant to the law of the case doctrine, Wade's claim that his counsel was ineffective for failing to properly impeach government witness Agee regarding his paternity is due to be denied.

Wade also argues that his trial counsel failed to conduct a proper investigation because he did not discover that Wade had assisted Agee in opening a lawn care business. Wade claims that had his counsel conducted a proper investigation, he would have discovered that the city clerk could have confirmed that Agee filed for a business license for his lawn care business, and that Wade assisted him in filling out the form. (Doc. 158, Attachment 1 at 26). Wade further states that "had counsel did (sic) a thorough investigation he would have learned that petitioner did help Mr. Agee establish a legitimate Lawn Care business through Wilson Dismukes Hardware on Hwy. 90 in Mobile on April 1, 2008 where Mr. Agee bought (2) Zero Turn Bobcat stick steer riding mowers at $10,000.00 each, (2) Stihl chain

saws, (2) Honda 40" push cutters and other misc. Items (sic) and paid Wilson Dismukes $40,000.00 in cash for the equipment." (Id. at 5-6).   Wade also states that on the same date, "Agee went to Ellis Trailers or Ellis Trailer Sales on Howell's Ferry Road and bought a trailer to put his lawn care stuff on to be pulled behind his pickup for the sum of $10,000.00 which he paid for in cash."  (Id. at 6).  Wade contends that his attorney also failed to discover that he took Agee to an insurance agency in an attempt to help Agee obtain insurance for the lawn care equipment.   (Id.)   However, the trial record reflects that Wade's claim is false.   His trial counsel did uncover information regarding the lawn care business.

> BYRD: Well, you have a lawn care business, right?
>
> AGEE:  No, sir.
>
> BYRD: You didn't open a lawn care business?
>
> AGEE: No, sir. I was working for someone.
>
> BYRD: Didn't Marlon Wade take you to an insurance agent named Green to get insurance for your lawn care business?
>
> AGEE: Yes.
>
> BYRD: So you did have a lawn care business?
>
> AGEE: I had personal things I was just getting insurance on, sir.
>
> BYRD: Oh, but Marlon took you to this insurance agent to help you get that worked out, lined up?

>           AGEE: Yes, sir, yes, sir; correct.
>
>                              …
>
>           BYRD: But Marlon took you to an insurance
>           agent, Mr. Green, to get your lawn care
>           business insured or other things insured?
>
>           AGEE: My personal stuff insured. He
>           introduced me to the man.
>
>           BYRD: Trying to help you establish your
>           business?
>
>           AGEE: I was looking into establishing one,
>           sir.
>
>           BYRD: Trying to get out of the dope
>           business; right?
>
>           AGEE: Yes, sir.

(Doc. 133 at 19-20). When viewed against the record, Wade's claim that his counsel failed to investigate the assistance Wade provided to Agee with respect to his alleged lawn care business is false, and therefore, due to be dismissed. See Scott v. United States, 325 Fed. Appx. 822, 824 (11th Cir. 2009) (the district court is not required to hold an evidentiary hearing "where petitioner's allegations are affirmatively contradicted by the record.").

Wade also complains that his trial counsel failed to properly investigate Agee's work history so as to discover that Agee was committing perjury when he testified that he was working at the time that Wade was in Texas. (Doc. 158, Attachment 1 at 31-32). Wade believes that had his counsel been

able to effectively cross-examine Agee and prove Agee's perjury in this regard, it would have impacted the jury.  However, just as the Eleventh Circuit determined that Wade's counsel "was able to cross-examine Agee thoroughly," notwithstanding Agee's false testimony about not having any children, this Court finds likewise with respect to Agee's work history. Wade, 399 Fed. Appx. at 477-78.  Assuming Agee lied about his work history, this fact would have added little to the thorough cross-examination of Agee which was performed by Wade's counsel at trial.

Wade further argues that his trial counsel failed to properly investigate and discover that while Wade was in Texas during December 2008, Agee sent a text message to  Wade, and in the text message, Agee threatened to harm Wade's children if Wade did not repay an alleged $2000 loan. (Doc. 158, Attachment 1 at 5).  However, the record reflects that Wade's trial counsel was aware of this information, and that this issue was extensively and thoroughly examined during trial.  During his opening statement, Wade's counsel stated, in part, as follows:

> Marlon Wade in August borrows $2,000 from Nathaniel Agee.    And Marlon goes to Beaumont, Texas, to get a job with Exxon. Marlon's working out there in local 505 IBEW-- 505 – union job, because everything's unionized out there.  Nathaniel Agee wants a job out there.  Nathaniel's not a member of the union.  Marlon can't get him a job. Nathaniel gets upset.

> Nathaniel Agee then calls Marlon and threatens Marlon's boys and says: Pay me the money or I'm going to hurt somebody you love.
>
> The next day Marlon sends Agee a $500 MoneyGram. This is December of '08. Marlon comes home in December of '08 for Christmas.

(Doc. 132 at 32).

During trial, the following was stated:

> BYRD: Did Mr. Agee ever contact you while you were in Texas about repaying this $2,000?
>
> WADE: Yes, sir, he did.
>
> BYRD: What did he say to you in that contact?
>
> WADE: He sent me a text message. The first message he sent, when I heard from him, he said he was going to hurt my kids if I didn't send him the money. That was the first I had heard from him about the money.
>
> …
>
> BYRD: When did you receive that message from Mr. Agee?
>
> WADE: December, the first week of December.

(Doc. 133 at 125).

On cross-examination, the prosecution examined Wade regarding the text message:

> GRIFFIN: Now, let's go to your trips to Texas. You said that Mr. Agee had threatened you in Texas by text message; is that correct?
>
> WADE: 100 percent.

25

GRIFFIN: Did you report that to any law enforcement officer? You didn't, did you?

WADE: No, ma'am.

GRIFFIN: There's no report of that with any law enforcement agency?

WADE: No, there's not.

GRIFFIN: And you said you came back to your home, south Alabama, in December of '08; is that correct?

WADE: The same time (nodding head affirmatively).

GRIFFIN: And you didn't report, again, that Mr. Agee had threatened you as you claim, did you?

WADE: I didn't claim it. He did.

GRIFFIN: You didn't report it to anyone, did you, sir?

WADE: No, ma'am.

(Doc. 133 at 142-43).

Although the text message was discussed in much detail during the trial, Wade could offer no proof that the message ever existed.  At trial, the government was prepared to offer the testimony of FBI computer analyst Barbara Wadriski, who had searched Wade's phone and determined that there were no text messages on the phone for December 2008.  (Doc. 134 at 3-6). In lieu of Ms. Wadriski's testimony, the parties entered into an agreement in which counsel for Wade would be permitted to say that "his client says there was a text message" but would not

"represent that there actually was one" and that the government would be allowed to say that they did not produce a text message. (Id. at 9-10). Wade's trial counsel advised the Court that "I will say that Marlon Wade testified that he received a text message from Agee threatening his children. Ms. Griffin's response or rebuttal to that would be that there is no document, no physical evidence, of a text message other than Marlon Wade's testimony." (Id. at 10). The jury was informed that "[t]he parties agree that the only testimony of a threatening text message from Nathaniel Agee is Marlon Wade's testimony. The parties agree that there is no documentary evidence of this text entered into evidence." (Id. at 12).

In closing arguments, the government argued that "Mr. Wade had no tape, no surveillance, no police officer knowledge, no police officer approval. He's going to go out on his own and do what he calls, through his attorney, payback to someone he claims has threatened him in December, that he doesn't report to the police that somebody's threatened his children." (Id. at 18). Wade's counsel then argued in opposition that "Marlon Wade's motive was to protect his three sons. He told you he got a text message threatening his sons about a $2,000 debt he owed Agee for his trip to Texas to make money to support his family. That was his motive. He was scared for his sons. Don't confuse motive with intent. His intent was to deliver the cocaine to

the police." (Id. at 23). Wade's counsel also commented in
closing arguments that Wade attempted to "bust" Nathaniel Agee
because "Agee had sent him, according to Marlon Wade, a text
threatening his children and because Nathaniel Agee needed to be
removed. Marlon's children needed to be protected." (Id. at
34). In its rebuttal, the government argued that "there's no
text message of any threat," noting to the jury that "if for one
second someone had threatened his children, he would have
reported it. He would have notified law enforcement." (Id. at
35). Thus, contrary to Wade's claim, the record reflects that
Wade's trial counsel was well aware of the alleged text message,
and that the issue was extensively and thoroughly examined
during trial.

Wade also makes a short, conclusory allegation that his
counsel failed to investigate the evidence that Agent Nixon and
AUSA Deborah Griffin had tried to "set up" Wade once before.
(Doc. 158 at 8). However, this accusation is a self-serving,
conclusory statement of which there is no proof. Conclusory
allegations based upon unsupported generalizations are due to be
denied without an evidentiary hearing. Lynn v. United States,
365 F.3d 1225, 1239 (11th Cir. 2004). Therefore, this claim is
due to be denied.

Assuming arguendo that Wade has shown an improper
investigation by his counsel with respect to any of the issues

28

discussed above, he has still failed to show ineffective assistance of counsel, as he has failed to establish the second element of the Strickland test, which is prejudice. As noted previously, Wade "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Mills, 63 F.3d at 1020. "Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, see id., or vice versa." Holladay, 209 F.3d at 1248. Just as the Eleventh Circuit found, "the evidence presented at trial supporting Wade's conviction was substantial, including undisputed evidence that Wade exchanged the gun and vehicle title for a kilogram of cocaine and then was arrested with the cocaine in his possession." Wade, 399 Fed. Appx. at 477-78. Wade has failed to show that he was prejudiced in any way by his trial counsel's alleged failure to investigate; therefore, this ineffective assistance of counsel claim is due to be denied.

## 2. Failure to Subpoena Records

Wade next argues in his Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 that his trial counsel was ineffective for failing to subpoena various records prior to trial. (Doc. 158). In particular, Wade argues that his counsel

29

failed to subpoena the telephone records for his cellular phone and the telephone records for the numbers 423-0878, 753-9474, and 490-4667, which, according to Wade, would have served as an "effective impeachment tool" at trial.  (Doc. 158, Attachment 1 at 8).  The crux of this claim appears to be that Officer Nixon falsely testified at trial that on the day of Wade's arrest, he told Officer Nixon that he was selling to a middleman named Danny Miller.  According to Wade, had his counsel subpoenaed the subscriber records for his phone and the phone numbers 423-0878, 753-9474 and 490-4667, he would have been able to establish that the numbers belonged to Wade's girlfriend, his union superintendent, Danny Lang, and his father, respectively, and that on the day in question, April 15, 2009, Wade called these individuals, as opposed to the alleged middleman named Danny Miller.  Wade argues that this information would have effectively impeached Nixon's trial testimony that on the day of his arrest, Wade told Nixon that he was selling to a middleman named Danny Miller, and that during the time leading up to Wade's arrest, he had called Miller.  (Id. at 8-9; 4, 7-11).

In the Government's response to Wade's petition, the Government argues that Wade's claim regarding Agent Nixon's testimony concerning Danny Lang/Danny Miller is "factually false and a deliberate attempt to mislead the court."  (Doc. 163 at 26-27).  The Government claims that Wade is attempting to

mislead the Court regarding Agent Nixon's testimony, or lack thereof, concerning "Danny Miller" vs. "Danny Lang."  (Id.).

First of all, the record reflects that contrary to Wade's contention, his counsel did obtain a copy of the phone records for Wade's cell phone, and those records were entered as an exhibit at trial.  Also, during discovery, the Government produced a copy of a FBI-302.  In the statement, Wade is listed as stating as follows:

> Wade advised that he was purchasing the cocaine for the president of [redacted] Bank, a banker named [redacted].  Wade also said there was a middle man involved in the case but refused to reveal his name to TFA Nixon.  SSA White also talked with Wade.  He told SSA White that he was to give the cocaine to a middle man named Danny Miller. Miller would then take the cocaine to [redacted].  Miller would eventually pay Wade after he (Miller) delivered the cocaine to [redacted].

(Doc. 104, Attachment 1 at 4).

Also, during trial, Agent Nixon was questioned about Danny Miller on cross examination and testified as follows:

> BYRD: Well, tell me, Mr. Wade said he was lying to Agee.  In the telephone conversations Mr. Wade said to Agee:  "Call me back in just a second.  I'm going to call my man and talk to him."
>
> And then they would hang up and Agee would call back a few minutes later.  You've checked the phone records to see who Mr. Wade called in that intervening time, didn't you?

NIXON: I can't remember if we checked the exact calls. But we checked a number of calls that were taking place on that date.

BYRD: Mr. Wade didn't call anybody in those intervening times, did he? He was lying to Mr. Agee?

NIXON: I'm sorry?

BYRD: Mr. Wade –

NIXON: You're incorrect, Mr. Byrd.

BYRD: Excuse me?

NIXON: You're incorrect. Mr. Wade made a number of phone calls after and before these conversations took place with Mr. Agee.

BYRD: And during the intervening time between the calls when Mr. Wade would say on the tape recording: "I'm going to call my man," and Agee would call him back and ask: "Did you call your man?" Mr. Wade would say: "Yes, I did." You checked, and Mr. Wade didn't call anybody, did he?

…

BYRD: Well, you said that Mr. Wade gave you the name of the middle man and of the person to whom he was going to sell it to; right?

NIXON: Yes.

BYRD: He never called those people, did he?

NIXON: Yes. He did.

BYRD: When?

NIXON: There's a number of phone calls to one of the individuals on these phones.

BYRD: When?

> NIXON: I think it's all during like the past two weeks, possibly longer than that, prior to the arrest.
>
> BYRD: What, what person was that being called?
>
> NIXON: His last name was Miller.  I believe it's Danny Miller, if I'm not mistaken.

(Doc. 132 at 75-77).

While Wade argues that the telephone records would have shown that during the period in question, he did not call Danny Miller, as contended by Officer Nixon, he has not offered any evidence in support of his contention.  Moreover, assuming *arguendo* that the records would have in fact established that Wade did not call "Danny Miller", he has not demonstrated that there is a reasonable probability that the records would have changed the outcome of the case.  As noted by the Eleventh Circuit, the evidence in this case against Wade was substantial and included undisputed evidence that Wade exchanged the gun and vehicle title for a kilogram of cocaine and then was arrested with the cocaine in his possession.  Wade was aggressively represented by trial counsel and the jury heard and rejected Wade's testimony that he did not know Danny Miller, and that he was involved in the drug transaction in an effort to set up Agee.  Accordingly, Wade has failed to show ineffective assistance of counsel as he has failed to meet either prong of the Strickland standard.

Wade also argues that his counsel was ineffective for failing to subpoena the bank records of Nathaniel Agee to show that he had withdrawn $2000.00 from his bank account to give to Wade just prior to Wade leaving to go to Texas to work. (Doc. 158, Attachment 1 at 26). Wade contends that his counsel should have subpoenaed the records of Wilson Dismukes Hardware as well. (Id.). Wade also argues that Agent Nixon's records from Internal Affairs should have been subpoenaed so that his counsel could have discovered that "numerous of complaints (sic) had been filed against Officer Nixon for falsifying documents and lying during other trial." (Doc. 158, Attachment 1 at 28).

These three claims also fail to show ineffective assistance of counsel. First, as to the bank records of Mr. Agee, Wade fails to provide any proof that these records even exist, and assuming that such do exist, he offers nothing to suggest that they contain information that is favorable to him. The only assertion by Wade concerning these bank statements are his own conclusory statements – with no additional proof. Again, conclusory allegations based upon unsupported generalizations are due to be denied without an evidentiary hearing. Lynn, 365 F.3d at 1239.

Next, as to Wade's claim that defense counsel should have subpoenaed documents from Wilson Dismukes, the record reflects that Agee admitted having personal lawn care equipment, admitted

that Wade assisted him in obtaining insurance, and further admitted to cutting Wade's yard; thus, even if the Wilson Dismukes documents had been subpoenaed and admitted, they would not have impeached Agee's testimony.  Further, the invoices which Wade has attached to his Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 are not authenticated, are not self-authenticating business records, and are not accompanied by an affidavit from any custodian of records. Additionally, the invoices total approximately $17,675.15, as opposed to the $40,000, as Wade states.  Pageant Even assuming the invoices could have impeached Agee's testimony, just as the Eleventh Circuit has already held, Wade's counsel was able to thoroughly cross-examine Agee and impeach him.  Thus, this claim does not meet the prejudice prong of the Strickland standard.

Finally, Wade claims that his counsel failed to subpoena internal affairs records regarding complaints against Agent Nixon.  Here again, this is a conclusory and self-serving allegation wholly unsupported by any proof.  As such, it is due to be denied without an evidentiary hearing.  Lynn, 365 F.3d at 1239.

Even assuming arguendo that Wade's counsel had in some way failed to properly subpoena records for the trial in this matter, he has failed in each instance to show that he was prejudiced by the failure.  As has been noted, Wade "must show

35

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and both parts of the test must be satisfied to show a violation of the Sixth Amendment. Mills, 63 F.3d at 1020. The Court need not address the performance prong, if the prejudice prong is not met. Holladay, 209 F.3d at 1248. Just as the Eleventh Circuit found, "the evidence presented at trial supporting Wade's conviction was substantial, including undisputed evidence that Wade exchanged the gun and vehicle title for a kilogram of cocaine and then was arrested with the cocaine in his possession." Wade, 399 Fed. Appx. at 477-78. Wade has failed to show that he was prejudiced in any way by his counsel's alleged failure to subpoena documents, and therefore, this ineffective assistance of counsel claim is due to be denied.

3. Failure to Subpoena Witnesses

Wade also claims that his counsel was ineffective for failing to subpoena and call witnesses which were present during his trial. (Doc. 158 at 8). In his Motion, Wade does not provide the names of these potential witnesses. (Id.). In reviewing a lengthy memorandum filed in support of Wade's Motion to Vacate, he identifies the following persons: Wade's son (unnamed), Leo Roberts, Marlon Wade, Sr., and Ray Gould, and states that these individuals could have testified that witness

36

Nathaniel Agee had worked on roofing jobs with Wade.  (Doc. 158, Attachment 1 at 6).

Additionally, Wade claims that his attorney should have subpoenaed the custodian of the telephone records for T-Mobile, Verizon Wireless, and AT&T and had the custodian testify at trial.  (Id. at 10).  It appears that Wade believes that the records custodian could possibly have testified that Wade never called anyone by the name of Danny Miller, which, according to Wade, would have "established to the Court and in the eyes and minds of the jury that Officer John Nixon and Informant Nathaniel Agee were lying or committing perjury when they testified that defendant called a middleman named Danny Miller, which, in all probability, would have resulted in the Defendant being acquitted of the charge."  (Id. at 11).

Wade also asserts that his attorney was ineffective for failing to subpoena "an expert witness from AT&T prior to trial" so that the witness could testify that the Federal Government or the Federal Bureau of Investigation could have "permanently and conveniently" deleted all the text messages from Wade's phone for the period of time of November 2008, through January 2009, including the particular text that Wade claims he received from Agee in which Wade claims that Agee threatened to hurt Wade's children.  (Id. at 22-23).

Wade also contends that his counsel was ineffective for failing to subpoena the bank teller who could have testified that "petitioner did enter the bank along with Mr. Agee during the month of November 2008, and she witness (sic) Mr. Agee hand Mr. Wade the $2000.00 he withdrawed (sic) that day." (Id. at 26).

Wade makes a general claim that his counsel should have subpoenaed "other witnesses as instructed by the petitioner" who could have testified that Agee gave the $2000 to Wade as a down payment on the motorcycle, and that after Agee's encounter with the law in December 2008, he called Wade, wanting the $2000 back because he could no longer afford to purchase the motorcycle. (Id. at 26).

Wade further complains that his counsel failed to hire an expert to "enhance[] the clarity of the tapes that was introduced during the trial." (Id. at 28). Wade believes that the audio tapes of Agee and Wade discussing the subject drug deal were tampered with by the authorities, and that "an expert would have informed the court" of such. (Id.).

A crucial witness who should have be subpoenaed, according to Petitioner, is Roy Weaver. (Id. at 28). Mr. Weaver allegedly would have testified that "he had personally seen the text message." (Id.). Wade is not clear as to which text

38

message, but the Court assumes he is referencing the text message in which Agee allegedly threatened Wade's children.

Wade also complains that his attorney should have subpoenaed Travis Bedsole who "would have refuted Mr. Agee's allegations that he introduced him meaning Mr. Agee and Wade into the drug business (sic)." (Id. at 29). Wade states that although Agee testified that Bedsole is in now in the military, to the contrary, Bedsole is "a crack head and is running the neighborhood." (Id.).

Another witness which allegedly should have been subpoenaed is Tim Jones, President of Gulf Federal Bank. (Id. at 30). Mr. Jones, according to Wade, could have refuted the statement by Officer Nixon that the cocaine at issue was being purchased for Mr. Jones. (Id.). Wade further asserts that his counsel have also subpoenaed Gary Williams of Beaumont, Texas. Per Wade, Mr. Williams could have refuted the testimony of Mr. Agee who stated that he had no contact with Mr. Williams. (Id.).

The Court again notes that conclusory allegations based upon unsupported generalizations are due to be denied without an evidentiary hearing. Lynn, 365 F.3d at 1239. Wade's claims of ineffective assistance of counsel for failure to subpoena witnesses are based upon nothing but conclusory, self-serving allegations. There are no supporting affidavits from any of the alleged witnesses indicating what their potential testimony

would be, but instead, self-serving statements by Wade himself. Therefore, Wade's claim of ineffective assistance of counsel for failure to subpoena witnesses is due to be denied.

Moreover, even if Wade had shown a failure to subpoena witnesses on the part of his counsel, he has still failed to establish the second element of the Strickland test, which is prejudice. Therefore, he has failed to show ineffective assistance of counsel. As noted previously, Wade "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and both parts of the test must be satisfied to show a violation of the Sixth Amendment. Mills, 63 F.3d at 1020. The Court need not address the performance prong, if the prejudice prong is not met. Holladay, 209 F.3d at 1248. Just as the Eleventh Circuit found, "the evidence presented at trial supporting Wade's conviction was substantial, including undisputed evidence that Wade exchanged the gun and vehicle title for a kilogram of cocaine and then was arrested with the cocaine in his possession." Wade, 399 Fed. Appx. at 477-78. Wade has failed to show that he was prejudiced in any way by his counsel's alleged failure to subpoena witnesses; therefore, this ineffective assistance of counsel claim is due to be denied.

B.  Ineffective Assistance: Public Authority Defense

Wade next argues in his Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 that his trial counsel was ineffective for proceeding with a public authority defense instead of an entrapment defense.  The affirmative defense of entrapment "applies when a person not predisposed to commit a crime is induced to do so by the government." United States v. Sistrunk, 622 F.3d 1328, 1332 (11th Cir. 2010), cert. denied, --- U.S. ----, 131 S. Ct. 1529, 179 L. Ed. 2d 345 (2011). There are two elements to an entrapment defense: "(1) government inducement of the crime; and (2) lack of predisposition on the part of the defendant." Id. at 1333.  "The defendant's right to present the entrapment 'defense is conditional, since before an entrapment defense may be presented to the jury, an evidentiary foundation for a valid entrapment defense must be present.'" Id. (quoting United States v. Ryan, 289 F.3d 1339, 1343 (11th Cir. 2002) (alteration omitted).  "As the Court in Ryan held, '[i]n laying an evidentiary foundation for entrapment, the defendant bears the initial burden of production as to government inducement; once the defendant meets this burden, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime.'" Id. (quoting Ryan, 289 F.3d at 1343).  "To meet this burden, a defendant may produce

> any evidence sufficient to raise a jury
> issue 'that the government's conduct created
> a substantial risk that the offense would be
> committed by a person other than one ready
> to commit it.' This burden is light because
> a defendant is generally entitled to put a
> recognized defense to the jury where
> sufficient evidence exists for a reasonable
> jury to find in her favor. Nevertheless,
> evidence of the government's mere suggestion
> of a crime or initiation of contact is not
> enough. Instead, government inducement
> requires an element of persuasion or mild
> coercion. As the First Circuit has recently
> observed, 'inducement consists of
> *opportunity plus something like excessive*
> *pressure or manipulation of a non-criminal*
> *motive.'"*

Id. (quoting United States v. Brown, 43 F.3d 618, 623 (11th Cir.

1995) (citations omitted).  "Evidence of 'persuasion or mild

coercion' may be shown by evidence that the defendant 'had not

favorably received the government plan, and the government had

to 'push it' on him, or that several attempts at setting up an

illicit deal had failed and on at least one occasion he had

directly refused to participate."  Id. (quoting Ryan, 289 F.3d

at 1344).  "To raise an entrapment defense, 'a defendant must

prove more than that the government first solicited him or

merely provided the opportunity for the crime.'"  Id. (quoting

United States v. West, 898 F.2d 1493, 1502 (11th Cir. 1990).

"After the defendant meets his burden to show 'some evidence

that the government induced the defendant to commit the crime,

the question of entrapment becomes a factual one for the jury to decide.'" Id. (quoting Ryan, 289 F.3d at 1344).

It is certainly not ineffective assistance of counsel to fail to proceed on a defense which was unavailable – as was entrapment for Wade. Wade has shown no government inducement, nor has he shown lack of predisposition on his part. Furthermore, Wade himself testified that he was working on behalf of Saraland police officer Kenny Matthews to purchase the kilogram of cocaine in an attempt to "set-up" Agee; thus, it was reasonable strategy for counsel to pursue a public authority defense. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence… There are countless ways to provide effective assistance in any given case…" Strickland, 466 U.S. at 689. "A petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." Van Poyck, 290 F.3d at 1322. "A strong presumption exists that the challenged action constitutes sound trial strategy." Chateloin, 89 F.3d at 752. Wade has failed to show that his counsel was ineffective as to this issue; therefore, this claim is due to be dismissed.

C.  Ineffective Assistance: No Downward Departure

Wade, in an addendum to his Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, argues that his trial counsel was ineffective during sentencing for failing to file a

motion for a downward departure based upon "extraordinary family circumstance," and based upon Petitioner's substantial assistance to the government.   (Doc. 161 at 3).   However, the Court notes that at sentencing, counsel for Petitioner, strongly advocated for a downward departure because of Petitioner's children.

> BYRD:   Your Honor, I would submit that the statutory mandatory minimum of five years is more than a sufficient sentence in this case.
>
> If the court recalls the testimony of Mr. Wade's character witnesses, all of the teachers who came to testify for him, they all know him as a parent of three young boys, as a parent of three of their students over the years who had straight A's, who went to class, who never missed a day of school, who did their homework, who were model students.   That Marlon when to the PTA meetings and went to all the functions for the school and was the parent.
>
> He had divorced decrees, or Domestic Relation decrees had granted Marlon Wade custody of these three children; sole custody.   Not the women who were the mothers of these children because the court found that Marlon Wade was the best parent for them.   He raised these boys or was raising them and was doing a wonderful job.   The arrest in this case, the children were taken by their mothers.
>
> Since that time, DHR has intervened in at least one of the households and taken the child away temporarily because the mother was driving under the influence of alcohol with the child in the car.   The children have not been attending school regularly. They have not gotten the parenting that they need or that they were getting from Marlon

> Wade.   It is tearing him apart that this is
> happening to his three sons.
>
> I would suggest, Your Honor, that while the
> guidelines   have   given   him   an   advisory
> sentence,   that   under   the   circumstances   of
> the  parent  he  was,  of  his  prior  history,
> that  the  court  come  down  to  the  statutory
> minimum   of   a   five-year   sentence   and   we
> respectfully request that.

(Doc. 139 at 12-13).   The Court was also aware of Wade's family

situation based upon the information contained in the PSI.

(Doc. 89).   Additionally, during sentencing, the Court was

advised of Wade's assistance to the United States in another

prosecution.   The following was stated by Mr. Byrd:

> [A]fter   his   arrest   Marlon   Wade   was
> incarcerated   with   Tommy   Lunsford   in   the
> Metro  jail  and  Mr.  Wade  was  fully  debriefed
> by  the  government  in  that  matter.   He  never
> reached   an   agreement   as   to   cooperation   but
> the government used that information.
>
> In fact, a direct quote from Mr. Wade is in
> the  newspaper  article  from  Mr.  George  May
> about  the  Lunsford  case  and  shortly  after
> Mr.   Lunsford   was   advised   of   all   the
> information  that  Marlon  Wade  had  provided
> the  government,  Mr.  Lunsford  pled  guilty.
> There  is  no  5K,  there  is  no  agreement,  or
> departure  from  that,  but  Mr.  Wade  did
> cooperate  and  did  give  them  information  and
> did  assist  the  government  in  that  regard  and
> I   respectfully   submit   that   a   five   year
> sentence is more than appropriate.

(Doc. 139 at 15-16).

Based on these factors, this Court imposed a sentence that was 18 months below the advisory guideline range.[5] It cannot be said that the representation by Wade's counsel was not reasonable and effective. As with each of Wade's other habeas claims, he has failed to satisfy the <u>Strickland</u> burden by showing that his counsel's performance was deficient, and further, that he has suffered prejudice. He has not and cannot demonstrate deficient performance on the part of his attorney, nor can he demonstrate prejudice. This claim, therefore, is due to be denied.

## V. <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned recommends that a certificate of appealability in this case be denied. 28 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his

---

[5] Wade's counsel also challenged the PSI more than once and was able to have Wade's base level offense moved from a 32, with the guideline range from 235 to 293 months, to a 26, with the guideline range from 108 to 135 months. (Docs. 80, 83, 85, 89, 106). The Court sentenced Petitioner to 90 months, noting that under all the circumstances, the guidelines did not provide an appropriate sentence, imposing a sentence "slightly below [the guidelines] because of all the facts and circumstances that are known to me at this point in time." (Doc. 139 at 16-17).

habeas corpus petition only where a circuit justice or judge issues a certificate of appealability.  28 U.S.C. § 2253(c)(1). A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Where a habeas petition is being denied, in part, on procedural grounds without reaching the merits of an underlying constitutional claim, "a COA should issue [only] when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Where a habeas petition is being denied on the merits of an underlying constitutional claim, a certificate of appealability should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Id. ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under Barefoot [v. Estelle, 463 U.S. 880, 893 (1983)], includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to

deserve encouragement to proceed further.") (internal quotation marks omitted); accord Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

None of Petitioner's claims are such as would warrant the issuance of a Certificate of Appealability. The recommendation that these claims be denied is based on the straightforward application of clear Circuit precedent, and no reasonable jurist could differ on the appropriate disposition of the claims on the record presented. It is thus recommended that the Court deny any request for a Certificate of Appealability.

## VI.   CONCLUSION

For the foregoing reasons, it is recommended that Petitioner's § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Docs. 158, 161) be denied, that this action be dismissed, and that judgment be entered in favor of Respondent, the United States of America, and against Petitioner, Marlon Rayford Wade, II. In addition, the undersigned Magistrate Judge is of the opinion that Petitioner is not entitled to issuance of a Certificate of Appealability. It is so recommended.

DONE this the **20th** day of **June, 2012**.

              **/s/ SONJA F. BIVINS**
              **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1. **Objection**.   Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[15] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the

---

[15]   Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]"   Fed. R. Civ. P. 72(b)(2).

objection may be deemed an abandonment of
the objection.

A magistrate judge's recommendation cannot be appealed to a
Court of Appeals; only the   district judge's order or judgment
can be appealed.

**2.  <u>Transcript (applicable Where Proceedings Tape Recorded)</u>.**
Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the
Magistrate Judge finds that the tapes and original records in
this case are adequate for purposes of review.  Any party
planning to object to this recommendation, but unable to pay the
fee for a transcript, is advised that a judicial determination
that transcription is necessary is required before the United
States will pay the cost of the transcript.